UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| KEVIN WALLACE, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 08-228 (RMC) |
| DISTRICT OF COLUMBIA, *et al.*, | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION

Kevin Thomas died after being shot eight times. Seven bullets came from guns fired by two officers of the District of Columbia Metropolitan Police Department ("MPD"). One came from a gun that Mr. Thomas pointed at his own head. The Medical Examiner determined that four of the eight gunshot wounds were potentially fatal and ruled the death a homicide, *i.e.*, "[t]he killing of one person by another." Black's Law Dictionary 751 (8th ed. 2004). Kevin Wallace, Mr. Thomas's father, sues the District of Columbia and the two officers who shot his son seeking to hold them civilly liable for Mr. Thomas's death. Pending before the Court is Defendants' motion for summary judgment. For the reasons stated herein, the motion will be granted.

I. FACTS

On February 10, 2007, MPD Officers Thaddeus Modlin and Alexander Vogel responded to a report of a shooting at 509 K Street in Northeast Washington, D.C.[1] The MPD dispatcher issued a "lookout" for a black male wearing a black shirt and blue jeans and armed with

---

[1] Mr. Thomas had accidentally shot his aunt while handling a gun.

a gun. When the officers arrived at the scene, they saw a person matching the description of the lookout, who was walking southbound in the eastside alley of the 900 block of Fifth Street, N.E. This person was later identified as Mr. Thomas.

Upon seeing Mr. Thomas in the alley, Officer Modlin got out of the police cruiser, removed his service weapon from its holster, and ordered Mr. Thomas to stop and show his hands. Mr. Thomas did not stop and show his hands but instead ran southbound through the alley and out into the street, with Officer Modlin following behind him and ordering him to stop. Officer Vogel initially pursued Mr. Thomas in his police cruiser but soon got out and joined Officer Modlin in the foot pursuit of Mr. Thomas. Both officers were in full uniform.

The officers chased Mr. Thomas onto the 600 block of I Street, N.E., at which point Mr. Thomas stopped running and turned around toward the officers with a gun in his hand. Officer Vogel pointed his service weapon at Mr. Thomas and ordered him several times to drop the weapon. Officer Modlin did the same. Mr. Thomas did not comply with the officers' commands and instead pointed the gun at his own head and threatened to shoot himself. While Mr. Thomas held the gun to his own head, he fired the weapon and shot himself. It is undisputed that the officers shot Mr. Thomas after Mr. Thomas had shot himself in the head. *See* Defs.' Statement of Facts ¶ 19; Pl.'s Statement of Facts ¶ 19.

Officer Vogel testified at deposition that:

A. At that time I noticed that the gun was coming down in my direction. I heard a gunshot and I returned fire.

Q. Did you see the gun? Did you see his hand moving with the gun in it?

>A. Yes.
>
>Q. First or did you hear the gunshot first?
>
>A. I saw his hand come down first, the movement first.
>
>Q. Did you see the muzzle flash?
>
>A. Yes.
>
>Q. Where did it flash?
>
>A. Right in front of him.
>
>Q. Was it still at his head when it flashed?
>
>A. It was coming down.
>
>Q. At that point you fired your weapon?
>
>A. Yes.
>
>Q. How many times?
>
>A. More than once.
>
>Q. Would five sound about right?
>
>A. Approximately.

Pl.'s Opp'n to Defs.' Mot. for Summ. J. [Dkt. # 24], Ex. 3 (Dep. of Alexander Vogel) at 16-17.

Officer Modlin was standing to the right of Officer Vogel and to the left of Mr. Thomas, creating a triangular shape. Officer Modlin testified at deposition that:

>A. At that time as I was still yelling loud verbal commands for Mr. Thomas to drop the gun I begin to see his right hand move as if he was taking the gun away from his head and about to turn it towards my partner. Then simultaneously I heard a shot and fearing for my

>    partner's life I fired.  I saw Mr. Thomas fall at that point.
>
> Q.  So, you heard a gunshot and saw Mr. Thomas' hand move at about the same time?
>
>    A.  I saw Mr. Thomas' hand move and then I heard a gunshot and then I fired.
>
>    Q.  So, you saw a hand move first?
>
>    A.  Movement.  Gunshot.  Me firing.  Yes.

*Id.*, Ex. 4 (Dep. of Thaddeus Modlin) at 21-22.

Mr. Thomas died from his gunshot wounds.  Chief Medical Examiner Dr. Marie-Lydie Y. Pierre-Louis conducted an autopsy on Mr. Thomas's body.  The autopsy revealed that Mr. Thomas was shot eight times.  Dr. Pierre-Louis determined that four of the eight gunshot wounds were potentially fatal.  One of the potentially fatal gunshot wounds was the self-inflicted wound to Mr. Thomas's head.  The others were to his neck, chest, and abdomen and were inflicted by the police.  Because all four of these gunshot wounds were potentially fatal and inflicted in close temporal proximity to each other, Dr. Pierre-Louis could not determine within a reasonable degree of medical certainty which caused Mr. Thomas's death.

However, Dr. Pierre-Louis determined the cause of death to be "multiple gunshot wounds" and the manner of death to be "homicide."  *Id.*, Ex. 6 (Amended Autopsy Report).  When asked why she determined the manner of death to be homicide, she answered "[b]ecause nobody goes and shoot[s] themself [sic] 1, 2, 3, 4, 8 times."  *Id.*, Ex. 5 (Dep. of Dr. Marie-Lydie Y. Pierre-Louis) at 36.  And, when asked if it were possible that the self-inflicted gunshot wound to Mr. Thomas's head killed him *before* he was subsequently shot by the police officers in the neck, chest, and abdomen, she answered that "it's not possible" because "[t]he other gunshot wound[s] have a hemorrhage along their path, there is bleeding associated with them meaning that the heart was

beating." *Id.* at 41.

On February 11, 2008, Mr. Wallace, individually and as the personal representative of the estate of Mr. Thomas, sued Officers Modlin and Vogel, in both their official and individual capacities, and the District of Columbia, seeking to hold them civilly liable for Mr. Thomas's death. Count I is against all Defendants and seeks recovery under the District of Columbia Survival Act, D.C. Code § 12-101 *et seq.*; Count II is against all Defendants and seeks recovery under the District of Columbia Wrongful Death Act, D.C. Code § 16-2701 *et seq.*; Count III is against all Defendants and alleges common law negligence; Count IV is against all Defendants and alleges assault and battery; Count V is against Officers Modlin and Vogel and alleges deprivation of civil rights under 42 U.S.C. § 1983; and Count VI is against the District of Columbia and alleges *Monell*[2] liability under 42 U.S.C. § 1983.

Discovery ended on August 3, 2009. Defendants moved for summary judgment on all remaining counts on October 14, 2009.[3]  *See* Dkt. # 20. Mr. Wallace opposes. *See* Dkt. # 24.

## II. LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together

---

[2] *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978).

[3] The Court dismissed Count VI of the Complaint because counsel for Mr. Wallace withdrew that count in open Court at a post-discovery status conference on August 14, 2009. *See* 08/14/2009 Minute Order. In addition, Mr. Wallace has now abandoned his negligence claim. *See* Pl.'s Opp'n at 10 n.1 ("The plaintiff is not advancing a claim for negligence inasmuch as the action[s] of the defendant officers were clearly and unequivocally intentional."). Therefore, the Court also will dismiss Count III of the Complaint. Because the Survival Act and Wrongful Death Act do not create substantive rights but rather provide remedies for tortious conduct that results in death, the § 1983 count (Count V) and the assault and battery count (Count IV) are the only substantive counts that remain.

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252.  In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id.* at 675.  If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).

### III. ANALYSIS

**A.  § 1983 Claim Against Officers Modlin and Vogel (Count V)**

Mr. Wallace asserts a federal constitutional claim against Officers Modlin and Vogel under 42 U.S.C. § 1983.  Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the

>Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  While Mr. Wallace asserts that the officers violated the Fourth and Fifth Amendments to the United States Constitution, *see* Compl. [Dkt. # 1] ¶ 28, the Supreme Court has clarified that "*all* claims that law enforcement officers have used excessive force — deadly or not — in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis in original).  Under that standard, "whatever the circumstances prompting law enforcement officers to use force, whether it be self-defense, defense of another or resistance to arrest, where, as here, a fourth amendment [sic] violation is alleged, the inquiry remains whether the force applied was reasonable." *Wardlaw v. Pickett*, 1 F.3d 1297, 1303 (D.C. Cir. 1993).  "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 398.

The officers first argue that Mr. Wallace cannot establish a Fourth Amendment violation as a matter of law because the evidence is inconclusive as to whether Mr. Thomas died from one of the bullets they fired at him.  The argument can be quickly disposed of.  Whether Mr. Thomas died from a bullet fired by the officers is a material fact as to which there is a genuine issue.  Therefore, it is an issue for the jury to decide at trial, not the Court on summary judgment.  *See Anderson*, 477 U.S. at 249 ("at the summary judgment stage the judge's function is not [her]self to weigh the evidence and determine the truth of the matter but the determine whether there is a genuine issue for trial").  Mr. Wallace need not "prove by the preponderance of the evidence that the

decedent died from being shot by the police" just to present that very question to the jury. Defs.' Mem. in Supp. of Mot. for Summ. J. at 6.

The officers' stronger argument is that they are entitled to qualified immunity. The officers' qualified immunity defense is evaluated under the two-step analysis set forth in *Saucier v. Katz*, 533 U.S. 194, 200-02 (2001). *See Johnson v. District of Columbia*, 528 F.3d 969, 973 (D.C. Cir. 2008). "Under *Saucier*," the Court first asks "whether the officer's alleged conduct violated a constitutional right, the same question . . . ask[ed] to test the merits of [Mr. Wallace's] § 1983 claim." *Id.* "If the facts alleged do establish that a constitutional right was violated," the Court "go[es] on to ask whether that right was 'clearly established.'" *Id.* (quoting *Saucier*, 533 U.S. at 201).[4] "Qualified immunity cannot be granted on summary judgment, however, if there is a genuine issue as to a material issue of fact." *Arrington v. United States*, 473 F.3d 329, 339 (D.C. Cir. 2006).

"The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Id.* However, "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Id.* "Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened

---

[4] "The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).

infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id.* "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

Judged against this standard, the Court finds that no constitutional violation occurred here because the use of deadly force was objectively reasonable under the circumstances. Officers Modlin and Vogel were responding to a call that a person had been shot and that the suspect was armed with a gun. When the officers, both of whom were in full uniform, approached Mr. Thomas and ordered him to stop and show his hands, Mr. Thomas disobeyed the order and attempted to flee. After the chase came to an end, Mr. Thomas turned toward the officers and brandished a gun in his hand. Both officers pointed their service weapons at Mr. Thomas and repeatedly ordered him to drop the gun. He again disobeyed their orders and put the gun to his own head and threatened suicide. The officers both observed Mr. Thomas's hand move toward Officer Vogel and then heard a gunshot. Believing that Mr. Thomas was intending to shoot Officer Vogel, the officers opened fire. That the officers' belief may have been wrong does not mean that it was not objectively reasonable under the circumstances. These are the type of split-second judgments made under tense circumstances that courts should not second-guess with the 20/20 vision of hindsight. *See Graham*, 490 U.S. at 396-97.

In *Garczynski v. Bradshaw*, 573 F.3d 1158 (11th Cir. 2009), police responded to a

911 call of a suicidal man armed with a gun. The court held that the use of deadly force was objectively reasonable under the circumstances because of the man's "refusal to comply with the officers' commands." *Id.* at 1168. The court noted that the man refused to show his hands or drop his gun as ordered by the officers and then "swung the gun from his head in the direction of the officers, at which point they fired." *Id.* Under those circumstances, the court found that "[t]he officers reasonably reacted to what they perceived as an immediate threat of serious harm to themselves." *Id.*

Mr. Wallace argues that *Garczynski* is distinguishable because Mr. Thomas never pointed his gun at Officer Modlin or Officer Vogel. Pl.'s Opp'n at 8. However, both officers testified that Mr. Thomas moved the gun in Officer Vogel's direction before they heard a gunshot. *See* Vogel Dep. at 16-17; Modlin Dep. at 21-22. And in *Garczynski* the court stated that "[e]ven if we assumed that Garczynski did not point his gun in the officers' direction, the fact that Garczynski did not comply with the officers' repeated command to drop his gun justified the use of deadly force under these particular circumstances." *Garczynski*, 573 at 1169. The Court agrees that "'the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect.'" *Id.* (quoting *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007). As in *Garczynski*, "the officers did not have control over" Mr. Thomas "and there was nothing to prevent him from shooting at the officers in an instant." *Id.* Mr. Thomas, like Mr. Garczynski, "repeatedly disobeyed the officers' orders, first to show his hands and then to drop his gun." *Id.* "These factors, even assuming that Garczynski never pointed the gun at the officers, provided a sufficient basis for the officers reasonably to believe that Garczynski posed an immediate risk of serious harm to them." *Id.* Mr. Thomas not only refused to obey repeated orders to drop his

gun; he also was suspected of just having shot someone and he had fled from the police. Given these additional facts, the officers were not unreasonable in believing that Mr. Thomas was an immediate threat to them. Because Officers Modlin and Vogel are entitled to qualified immunity, the § 1983 claim against them (Count V) will be dismissed.

### B. Assault and Battery Claims Against All Defendants (Count IV)[5]

Under District of Columbia law, an assault is "an intentional and unlawful attempt or threat, either by words or acts, to do physical harm to the victim." *Etheredge v. District of Columbia*, 635 A.2d 908, 916 (D.C. 1993). "'A battery is an intentional act that causes harmful or offensive bodily contact.'" *Id.* (quoting *Jackson v. District of Columbia*, 412 A.2d 948, 955 (D.C. 1979)). "The District is vicariously liable for the intentional and negligent acts of its officers acting within the scope of their employment." *Evans-Reid v. District of Columbia*, 930 A.2d 930, 937 (D.C. 2007). "As in most cases involving intentional shootings by police officers, . . . the issue of liability turns on the defense of privilege." *Id.*

"A police officer has a qualified privilege to use reasonable force to effect an arrest, provided that the means employed are not 'in excess of those which the actor reasonably believes to be necessary.'" *Etheredge*, 635 A.2d at 916 (quoting *Jackson*, 412 A.2d at 956). "Moreover, any person, including an officer, 'is justified in using reasonable force to repel an actual assault, or if he reasonably believes he is in danger of bodily harm.'" *Id.* (quoting *Johnson v. Jackson*, 178 A.2d 327, 328 (D.C. 1962)). "Use of 'deadly force,' however, is lawful only if the user actually and reasonably believes, at the time such force is used, that he or she (or a third person) is in imminent peril of death

---

[5] The Court has diversity jurisdiction over the assault and battery claims because Mr. Wallace, a Maryland resident, individually seeks to recover the pecuniary loss to him resulting from his son's death pursuant to the Wrongful Death Act.

or serious bodily harm." *Id.* (citing *McPhaul v. United States*, 452 A.2d 371, 373 (D.C. 1982)).

In determining the applicability of qualified privilege, the District of Columbia courts use the same objective reasonableness standard applicable to qualified immunity under § 1983. *See Etheredge*, 635 A.2d at 916 (applying the objective reasonableness standard of *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)); *see also id.* at n.10 (agreeing that "there are differences between a federal constitutional claim and a tort suit brought under District of Columbia law" but finding that *Graham's* objective reasonableness standard "reflects a realistic recognition of the perils of police work" that "does not turn on the forum in which the plaintiff subsequently seeks redress or on the legal authorities on which he relies"); *Evans-Reid*, 930 A.2d at 945 n.23 (finding that because "the evidence admitted is insufficient to overcome the defense of privilege to a claim of assault and battery, it would be similarly insufficient in the context of an immunity defense to a constitutional claim"). Accordingly, Officers Modlin and Vogel are privileged from tort liability for the same reasons they are immune from constitutional liability. The assault and battery claim (Count V) will be dismissed.

### C.      Survival Act and Wrongful Death Act Claims (Counts I and II)

Under District of Columbia law, "if a tort causes death, two interests have been invaded." *Runyon v. District of Columbia*, 463 F.2d 1319, 1321 (D.C. Cir. 1972). "The first is the interest of the deceased in the security of his person and property." *Id.* Under the Survival Act, "[t]he personal representative of the estate of [the] deceased may bring an action on behalf of the estate to recover for the invasion of that interest." *Id*; *see* D.C. Code § 12-101. "The second is the impairment of the interest of the deceased's spouse and next of kin." *Runyon*, 463 F.2d at 1321. Under the Wrongful Death Act, the deceased's next of kin "may recover pecuniary loss resulting

from the death provided the personal representative of the deceased's estate prevails in their behalf in the wrongful death action established by statute." *Id.*; *see* D.C. Code § 16-2701. Thus, "[t]he survival statute compensates the estate for injuries caused to the decedent while the wrongful death provision gives a right of action to his survivor who suffers a loss because of his death." *Nelson v. Am. Nat'l Red Cross*, 26 F.3d 193, 199 (D.C. Cir. 1994). "Under both statutes, the plaintiff nonetheless needs a viable cause of action at the time of death." *Id.* In other words, the Survival Act and Wrongful Death Act do not create substantive rights but rather provide remedies for tortious conduct that results in death. Because all substantive causes of action have been dismissed, Mr. Wallace's Survival Act and Wrongful Death Act claims must also be dismissed.

### IV.  CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment [Dkt. # 20] will be granted. A memorializing Order accompanies this Memorandum Opinion.


Date: February 22, 2010                                         /s/
                                                ROSEMARY M. COLLYER
                                                United States District Judge